## Case No. 12,692.

### The SHADY SIDE.

### [17 Blatchf. 132.] [1]

### Circuit Court, S. D. New York. Aug. 28. 1879.[2]

COLLISION—IN SLIP—RUNNING IN FOG—SPEED—WHISTLE—AMOUNT OF RECOVERY—COSTS.

1. A steam tug moving in a slip, in a fog, and inside of the ends of the piers, is not required to sound her steam whistles, as a signal to a steamer moving up the river outside of the slip, and which runs into the slip and collides with her.

2. A steamer running up a river in a fog mistook her way and ran into a slip at a speed which made it impossible for her to stop, so as to avoid a collision with a tug inside of the slip, after the tug came in sight, and was *held* in fault for not running at a moderate speed in a fog.

3. The tug having been sunk by the collision, the libellant procured her to be raised. She was sold to the libellant for $18, in a suit against her by the person who raised her. The libellant afterwards paid the charge for raising her, $600. The expense of repairing her, added to the cost of raising her and a reasonable demurrage, exceeded what would have been her value when repaired. This court allowed the libellant $3,500, as her value at the time of her loss, as a total loss. The value of what was saved was sufficient to pay the expense of saving it, but no more; and the value of the tug when raised was equal to the expense incurred in searching for and raising her, but no more.

4. This court allowed to the libellant his costs in the district court, and, as the claimant had been partially successful on the appeal, it divided the costs in this court.

[Appeal from the district court of the United States for the Southern district of New York.]

This was a libel in rem, filed in the district court, for a collision. That court decreed for the libellant, with costs [Case No. 12,691], and awarded to him $5,000, as the value of his tug at the time of her loss, as a total loss, with interest; $600, as the expense of raising her, with interest; $250 for the time and disbursements of the libellant, after the collision, in finding his tug and preserving her; and $300 for her furniture lost, not appurtenances, with interest; in all, $6,803.10, for which amount, with interest, and $720.37, costs, being, in all, $7,616.05, a decree was entered. The claimant appealed to this court. This court found the following facts: "At about eight o'clock in the morning of March 16, 1875, the steam tug Mary, owned by the libellant, and which had been laid up the night before on the upper side of pier 52, East river, New York, near the bulkhead in the slip between piers 52 and 53, left her

1 [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]
2 [Modifying Case No. 12,691.]

berth to back across the slip, and take on her fenders, either at pier 53, or at a brig lying alongside that pier. The brig lay at the lower side of the pier, with her bow toward the bulkhead of the slip, and her stern about seventy feet inside the outer end of the pier. The brig was about one hundred feet long. Pier 52 was about two hundred feet long, and pier 53 about two hundred and eighteen. The slip between them was about five hundred and fifty feet wide. The tide was strong ebb, and a thick fog was prevailing. The Shady Side was a side-wheel steamer, running on a ferry between pier 22, East river, and Morrisania. She left her pier at 7.45 that morning, bound up the East river, on a trip to connect at Morrisania with the Port Chester Railroad, at 8.25. When she was about opposite Catharine street, the fog growing thicker, she was slowed down, and her course, which, to that time, had been well out in the river, going up parallel with the ends of the piers, was changed so as to head, as was supposed, about for the end of pier 53. That pier could not be seen at the time, and the course was shaped by compass. At pier 38 the fog lighted up again, and she was run at full speed until she reached pier 45, when, the fog again becoming thicker, she was slowed once more, and her course changed, so as to bring her in nearer the piers. She passed pier 52 not a great distance away, and headed on her course, which would take her somewhat inside the end of pier 53. That pier could not then be seen from her. When the Shady Side was passing pier 52, the Mary was in the slip, about halfway across from pier 52 to the brig. She lay a little angling across the slip, her stern being nearer the brig than her bow. Her stern was not then as far out toward the end of the pier as was the stern of the brig. Her engine was stopped, though she still had a little sternway on. The intention was to have her taken by an eddy in the slip over towards the brig. The wheelsman on the Shady Side first saw the Mary when he, in the pilot house, was about opposite, or a little past, pier 52. The attention of the captain was at once called to the Mary, and he rang the bell to stop and back, and hove the wheel hard over to starboard. The Shady Side was at the time headed for the Mary, and under strong headway. The Mary, seeing her coming, commenced backing, but, before the Shady Side could be stopped, or the Mary got out of the way, the vessels came together, the Shady Side striking the Mary on her port side, about twenty feet aft of the stem, cutting into her nearly as far as the keel. The force of the blow was such as to throw the captain of the Mary, who was standing on the outside of the pilot house, and another man on deck, overboard. The engineer of the Mary got on board the Shady Side, without shutting off his engine, which was backing. The engine kept up its backward motion until the vessels got separated,

and then the Mary was carried about two-thirds the way across the river, and down as far as the bridge pier, where she sank. The Shady Side kept on under headway until she came within a few feet of the brig. When she stopped, she was headed so as to strike the brig about fifteen feet from the stern. The collision occurred a considerable distance inside the ends of the piers. The Mary did not sound her whistle when she left her berth, or at any time while moving in the slip. She at no time went outside the slip. The Mary was about sixty-eight feet long, and the Shady Side about one hundred and sixty-eight. Some time was spent in searching for the Mary, after she sank. She was found in very deep water, and in a much frequented part of the harbor. Some difficulty was experienced in getting parties willing to contract for raising her. She was at last raised, however, and taken to the Hoboken flats. The price paid for this work was six hundred dollars. While she was lying on the flats, an effort was made to have the claimant agree that she should be considered a total loss, and the rights of the parties determined accordingly. The claimant not assenting to this, the contractors for raising her commenced a suit against her, in admiralty, to recover the amount due them. This was done with the consent of the libellant, and, a decree having been obtained for her sale, she was bid in by the libellant for eighteen dollars. After this was done, the libellant paid the debt. He made no defence in the admiralty suit. Soon after the purchase was made at this sale, she was taken by the libellant to a dry dock in New York, where some repairs were made. But little was done, however, and she was taken down to pier 52. After lying there awhile, she was removed to a small creek on Long Island, and there beached. When she was raised she was not worth repairing. The cost of repairs, added to the expense of raising, and a proper allowance for demurrage, would amount to more than she would be worth when repaired. The value of the Mary, at the time of the collision, was thirty-five hundred dollars. Her value when raised was equal to the expense incurred in searching for and raising her, but no more."

E. A. Wilcox, for libellant.
Dennis McMahon, for claimant.

WAITE, Circuit Justice. The only fault charged upon the Mary is her failure to sound her whistle. The evidence leaves no doubt on my mind, that the collision occurred inside the ends of the piers, and that the Mary was simply moving across the slip. The sailing rules require, that steam vessels, when under way in a fog, shall sound their steam whistles, and, when not under way, their bell. This evidently applies to vessels moored, or moving in the way of commerce, and not to those lying at docks, or, ordinarily, to those moving about in slips. The object is not to notify vessels of their approach to the land, but of the proximity of other vessels in the waters they are navigating. The Shady Side was moving up the river. Her course was entirely outside the slip. A whistle sounded as a fog signal in the slip would tend to deceive rather than give information as to the actual facts. Such a signal would indicate the channel or fairway of the river, rather than a place inside the land, as a slip really is. What the Shady Side expected was information as to the waters she was to navigate, not the mooring places along the shore in the harbor. It was not a fault of the Mary, therefore, toward the Shady Side, to omit the sounding of her whistle. The Shady Side was clearly in fault. While running in a fog, in a harbor liable to be crowded, she mistook her way and ran into a slip at a speed which made it impossible for her to stop, so as to avoid a collision, after an obstruction came in sight. Such speed was certainly not moderate, under the circumstances, and indicated a want of caution, which is entirely inexcusable while navigating a harbor like that of New York, in a dense fog.

The real controversy in the case is as to the amount of damages. The libellant claims as for a total loss, because the expenses of repairs, added to the cost of raising and a reasonable demurrage, would exceed the value of the vessel when repaired. In this, I think, he is sustained by the evidence; but, if the boat had been sound and in all respects in a good condition at the time of the collision, the case would have been different. Neither the engine nor the boiler were seriously injured by the blow. The hull alone was hit. Had that been reasonably strong, it is scarcely to be believed that a cut into the side only, even as far as the keel, would have put her past repair. The fact, that, after she was taken out on the dock, her owner abandoned her, is evidence that, to his mind, her hull was not worth repairing. The mere mending of the break would not make an otherwise weak hull strong. Whatever damage happened to the engine and boiler, save in some unimportant particulars, was caused by the sinking. This seems to have developed the fact that the boiler was substantially worn out, and that the engine might possibly not be worth a new hull. The libellant, under these circumstances, is entitled to recover as for a total loss, less the value of what was saved.

The testimony as to value is conflicting and not altogether satisfactory. My conclusion, however, is, that the vessel was in a condition which made her liable to fail at any time. So long as she could be kept up, she would do reasonably good work, and make fair earnings, but, when she began to give out, she was likely to go altogether. She was nearly sixteen years old, and had been bought by the libellant, in Boston, for two thousand dollars, three years before. Somewhat extensive repairs were made on her after this purchase, and her market value in New York may have

been greater than it was in Boston. She was still, however, an old vessel. She had never been rebuilt. Her boiler was as old as the hull, and, undoubtedly, would have soon given out. Under all the circumstances, I cannot believe the actual value of the vessel was more than thirty-five hundred dollars. If it was, I am clear she ought to have been repaired. The value of what was saved is sufficient to pay the expense of saving it, but no more.

The libellant may take a decree for three thousand five hundred dollars, with interest at six per cent. from March 16, 1875. He is also entitled to recover his costs in the district court, but, as the claimant has been partially successful on his appeal, the costs in this court will be divided.